## CHARLES C. CHAMBERS *vs.* WAMPANOAG MILLS.

Bristol.    October 23, 1905. — November 29, 1905.

Present: KNOWLTON, C. J., LATHROP, LORING, BRALEY, & SHELDON, JJ.

*Negligence,* Employer's liability.

In an action by a weaver in a cotton mill against his employer, for an injury from being struck in the eye by a shuttle which flew upward between the hand rail and the shuttle guard of one of the looms he was operating, because the guard was bent or bellied out and thus failed to prevent the shuttle from flying out, it appeared, that the plaintiff operated eight looms in each of which the shuttle travelled across the loom one hundred and eighty or one hundred and ninety times a minute, that a shuttle guard is a permanent part of a loom and it is not the duty of a weaver to put it on or to examine it in any way, that the shuttle guard formerly on this loom broke, and the plaintiff asked the loom fixer to replace the broken part, that the loom fixer put on a new guard, that while this was being done the plaintiff kept his other looms going, that about every three minutes a loom stops because the shuttle becomes empty of yarn and the weaver has to fill and replace the shuttle as soon as possible, and has to walk backward and forward from one loom to another, starting them up and keeping the shuttle filled and the looms running all the time, that the plaintiff did not examine the loom after the loom fixer had put on the new guard and knew nothing about its condition before the accident, that when a guard rail breaks it is the duty of a loom fixer to put on a new one, that if the new rail is longer than the old one and is screwed on at each end in the old holes it will spring in the centre, which the loom fixers call " bellying," that a guard rail does not belly out unless it is too long, that it is the business of a loom fixer to know whether a guard is of the right length, and that after the accident the guard rail of the loom in question was found to be opened out and there was space enough for the shuttle to pass through. *Held,* that there was evidence of the defendant's negligence and of the plaintiff's due care, and that the plaintiff did not assume the risk of an accident from such a cause.

A weaver in a cotton mill does not assume the risk of being hit in the eye by a shuttle which flies out of a loom on account of a defective guard rail.

LATHROP, J.    This is an action of tort for injuries sustained by the plaintiff while in the employ of the defendant.    At the trial in the Superior Court the jury returned a verdict for the plaintiff ; and the case is before us on the defendant's exception to the refusal of the presiding judge to rule that there was no evidence which would warrant a finding for the plaintiff.    The plaintiff was employed to run eight looms, four in a row on each side of a narrow alley.    While at work at the fourth loom in one row, he was struck in the eye by a shuttle with the usual

pointed metallic end, which flew upwards between the hand rail and the shuttle guard of his second loom, the shuttle guard being so swollen or "bellied out" from the face of the hand rail, or reed cap as the front of the lathe sword is called, that the guard failed to fulfil its sole function of preventing a shuttle from leaving its proper course, flying upwards, and striking the operative.

Both the plaintiff and the defendant knew that, from one cause or another, a shuttle sometimes leaves, or attempts to leave, a loom in operation, and that the function of the guard, which is placed on all looms, is as above stated. The guard consists of a piece of metal, about one quarter of an inch in diameter and of the length of the path of the shuttle between the two shuttle boxes, which length is practically the width of the body of the loom. The guard is parallel with the hand rail, and, when of proper length and construction and in proper position and adjustment, is for most of its length nearly the width of a shuttle distant from the hand rail; but toward each end it turns at right angles to the hand rail, then runs closer to and parallel with the hand rail toward the ends of the loom, and at each end a loop is formed to receive a bolt which runs through the hand rail and is tightly fastened by a nut. Often there is a leather strap around a guard at its centre screwed to the hand rail. The guard should be directly over the outer portion of the path of the shuttle as it flies along the race board from one side or shuttle box of the loom to the other.

The plaintiff contends that at some time before the accident the old guard became broken, and the plaintiff having called the attention of the loom fixer of his section to the fact, the loom fixer put a new shuttle guard on the loom, from which the shuttle flew which caused the accident, and that such new guard was too long and for that reason "bellied out."

On direct examination the plaintiff testified that he was twenty-eight years old; that he learned to weave when fourteen years old, then worked as a weaver about a year, and subsequently, about ten months before the accident, resumed the occupation on the eight looms above mentioned. At the request of his counsel, using a model, he explained the names and functions of some of the parts at the front of a loom, illustrating its forward and backward movements and the way in

which a shuttle ordinarily travels. He also testified that the average speed of a loom was about one hundred and eighty or one hundred and ninety picks a minute, a pick corresponding to a single movement of the shuttle across the loom, the shuttle being struck by one picker, and then being struck by the other, returning; that there never is occasion for taking off a shuttle guard unless it is broken or improperly put on; that it is a permanent part of the machine, a part with which he, as a weaver, had nothing to do; that it was not part of his work to put it on, or to assist in putting it on, or to examine it in any way; that a man called a loom fixer has charge of a section of looms, and it is the fixer's business to keep the looms in his section in repair; that when a fixer goes to a loom to fix anything, the weaver is supposed to run his other looms, giving no assistance or directions, and it was not a part of his work to examine anything the fixer has done when the fixer has finished; " I wouldn't know anything about it anyway "; that there were about six hundred looms in the room in which he worked, being three sections and a part of another; that the shuttle guard and the lathe go back and forth all the time except when the loom is stopped; that each loom stops about every three minutes throughout the day because the filling runs out, that is, the shuttle becomes empty of yarn, and it is the work of the weaver to fill and replace the shuttle as soon as possible, " which takes only a couple of seconds, unless there is a thread out to draw in," during which operations the weaver's mind is upon getting the loom started as soon as possible; that he had to walk backwards and forwards from one loom to another, starting them up and keeping the shuttle filled and the looms running all the time.

The plaintiff further testified that it is no part of a weaver's work, when the loom stops at these intervals, to examine any of its parts; that about three or four weeks, perhaps two, before his injury, the old shuttle guard broke right on the end where the bend is; " I think it was broke right where it had been struck a time or two with the shuttle or something like that "; that he called the fixer in charge of that section, whose duty it was " to receive reports of the breaking of things, including the shuttle guard, and to remedy or replace a broken part," and

called his attention to the broken guard; that the fixer then put on a new guard; that while this was being done, he, the plaintiff, kept his other looms going, and did not superintend nor have charge of the fixer while he was putting on the guard, and did not examine his work after he had finished; that after the accident he did not examine the guard and knew nothing about the condition of the guard, except what may have been since told him by others; that he had not examined the guard before the accident, and had been given no knowledge, information or caution that there was anything wrong about it; that guards "are about as high as his waist," and are of different lengths for different breadths of looms; that with the guard on rightly the shuttle cannot fly up.

The plaintiff's work at the loom consisted of tying broken threads, changing the filling, by which is meant putting a new cop on the shuttle, and keeping the loom running. When anything happened to a loom the plaintiff called the loom fixer to attend to it, and worked on his other looms while the loom fixer was at work.

One McFarlane, a witness for the plaintiff, corroborated the testimony given by the plaintiff, and further testified that the proper distance between the hand rail and the shuttle guard is about an inch and a half or an inch and three quarters, about a quarter of an inch narrower than a new shuttle. "When a shuttle guard breaks and a necessity for a new one thus arises, it is the duty of the loom fixer to go to the machine shop and get a new one of the same kind and bolt it through the old holes in the hand rail, seeing that it comes square and that it is of the right length. If he selected or was given one longer than the old one, if he simply put it on through the old holes and did nothing else to it, it would spring in the centre, what loom fixers call 'bellying.' It would belly out. While the fixer is putting on a new guard, the weaver goes along working on his other looms, not assisting the fixer in any way. When through, the fixer starts the loom and goes away." He further testified that after the accident he went to the loom in question; that he "noticed the guard being opened out and space enough for the shuttle to come through it"; and that "it is the business of the loom fixer to know if a guard is of the right length."

This witness, who had been a loom-fixer for eighteen years, also testified that if the guard rail was too long it would belly out, and that he saw none belly out "unless they were too long"; that the guard rail was a permanent part of the machine, and that it was not taken out except when it was broken; and that it was no part of the weaver's work to examine the shuttle guard.

Ford, who was the loom fixer of the defendant in the section where the plaintiff worked at the time of the accident, was called by the plaintiff, and in some respects corroborated the testimony of McFarlane; in other respects, as the defendant contends, he gave evidence more favorable for the defendant. It is unnecessary to repeat it here.

The defendant contends that there was no evidence of the defendant's negligence; that the plaintiff assumed the risk; and that the plaintiff was not in the exercise of due care. We are of opinion that, upon the evidence, the judge properly refused to take the case from the jury; and that it could not have been ruled, as matter of law, that there was no evidence which could. have warranted a verdict for the plaintiff.

On the question of the defendant's negligence the only contention of its counsel is that there was no evidence that the guard rail was too long, and it is suggested that the bend in the guard rail might have been caused by the plaintiff's taking hold of the hand rail to pull the loom forward, or the guard. might have been bent by being struck by a shuttle shortly before the accident. It cannot be said that there was no evidence that the guard rail was too long, when a loom fixer of eighteen years' experience testified as we have above stated. As to the suggestion that the accident might have been caused by the plaintiff's taking hold of the hand rail to pull the loom forward, there is no evidence that he did so, and the testimony of the plaintiff is to the contrary. As to the other suggestion, the answer is that this, if true, would show that the guard rail had become bent by shuttles striking it, which might have been discovered on proper inspection by the defendant or the officers to whom it had entrusted the duty of inspection. So far as the evidence discloses there was no system of inspection in the mills of the defendant, and this would be evidence of negligence, if

for want of inspection an employee was injured. . *Toy* v. *United States Cartridge Co.* 159 Mass. 313.

The next contention of the defendant is that the plaintiff assumed the risk; but we are of opinion that, on the evidence, the question was for the jury. The risk was not an obvious one. The rule of law as to assumption of the risk does not apply where there is negligence on the part of the master in furnishing suitable instrumentalities for doing the work. *Boucher* v. *Robeson Mills*, 182 Mass. 500, and cases cited.

The last contention of the defendant is that the plaintiff was not in the exercise of due care. We are of opinion that this question was for the jury. The plaintiff testified that he did not know that there was anything wrong about the shuttle guard. This is not a case where it can be said that the plaintiff, in the exercise of reasonable care, must have known of the defect in the guard. It was undisputed that he had charge of eight looms, each loom making one hundred and eighty or one hundred and ninety picks a minute; that the shuttle in each loom had to be taken out and supplied with a new cop once in three minutes; and that other details, such as the breaking of threads, also required his care. All these facts show that the plaintiff's time was occupied in various matters, and it could not be ruled as matter of law that the plaintiff was not in the exercise of due care.

*Exceptions overruled.*

*R. P. Borden*, (*R. C. Davis* with him,) for the defendant.
*E. Greenhood*, for the plaintiff.